## UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| TIANNA LABOY and KARINE LABOY ex rel BABY N.<br>　　　　Plaintiffs | : : : : : : | 3:19-cv-307 (JCH) |
| v. | : : | |
| Scott Semple, Commissioner of the Connecticut Department of Correction in his individual capacity; Dr. Tricia Machinski, OB/GYN for York Correctional Institute; CO Alberto Ortiz; CO Silvia Surreira; RN Michelle Fiala; RN Brianna Simmons; Lt. Vega; Lt. York; Connecticut Department of Correction | : : : : : : : : : | |
| 　　all in their individual capacities | : : | |
| 　　Defendants. | : : : : | OCTOBER 6, 2020 |

## SECOND AMENDED COMPLAINT

### Preliminary Statement

This is a civil rights action filed by Tianna Laboy and Karine Laboy ex rel Baby N., for damages under 42 U.S.C. § 1983, alleging denial and delay in medical care in violation of the Fourteenth and Fourth Amendments to the United States Constitution as well as violations of the Americans with Disabilities Act. All defendants acted with wanton disregard for both Plaintiffs' lives, recklessly and maliciously.

### Subject Matter Jurisdiction and Venue

1. Jurisdiction over Plaintiffs' claims is based on 42 U.S.C. § 1983, 28 U.S.C. § 1331 and 28 U.S.C. § 1343.

2.   Plaintiffs' claims are also brought pursuant to the Americans with Disabilities Act (ADA) Title II, 42 U.S.C. §12131 et seq.

3.   Plaintiffs T. Laboy and Laboy ex rel Baby N. bring this action claiming deprivations of rights to be free from deliberate indifference and cruel and unusual punishment under the Fourth, and Fourteenth Amendments to the Constitution of the United States of America.

4.   Venue in this District is proper under 28 U.S.C. § 1391 because Defendants, at all times relevant to the complaint, are in based in the district and all activities relevant to this complaint occurred in this District.

**Parties**

5.   Plaintiff Tianna Laboy (sometimes "T. Laboy") is an inmate in the custody of the Connecticut Department of Correction ("DOC"). Plaintiff T. Laboy has inmate number 417372 and is housed in York Correctional Institute ("York").

6.   Plaintiff Karine Laboy ex rel Baby N. ("Baby N.") is the child of Plaintiff Tianna Laboy, born February 13, 2018 during the period of Plaintiff Tianna Laboy's  incarceration at York.

7.   Defendant Scott Semple, at all times relevant to this complaint, was the commissioner of the DOC.  Defendant Semple can be properly served at 24 Wolcott Hill Road, Wethersfield, Connecticut 06109. He is sued in his individual capacity.From approximately 1997 through July 1, 2018, University of Connecticut Medical Center, Correctional Managed Health Care ("CMHC" or sometimes "UConn/CMHC") and DOC were parties to a Memorandum of Agreement ("MOA") that contained the guidelines and criteria for inmates to receive healthcare from CMHC.

8. Defendant Dr. Tricia Machinski is an obstetrics and gynecology specialist who at all relevant times to this action was employed by the CMHC and assigned to York. Dr. Machinski is sued in her individual capacity. She can be served at 201 West Main Street, Niantic, Connecticut 06357.

9. Defendant Michelle Fiala was a medical staff member and registered nurse at CMHC assigned to York in February 2018. She is sued in her individual capacity.

10. Defendant Fiala no longer works at York.

11. Defendant Brianna Simmons is a medical staff member and registered nurse at CMHC assigned to York on and around February 2018. She is sued in her individual capacity. She can be served at 201 West Main Street, Niantic, Connecticut 06357.

12. Defendant CO Alberto Ortiz was assigned to the area of York where Plaintiff Tianna Laboy was housed between February 11, 2018 and February 13, 2018.

13. Upon information and belief, CO Alberto Ortiz can be served at 201 West Main Street, Niantic, Connecticut 06357.

14. Defendant CO Silvia Surreira was assigned to the area of York where Plaintiff Tianna Laboy was housed between February 11, 2018 and February 13, 2018.

15. Upon information and belief, CO Silvia Surreira can be served at 201 West Main Street, Niantic, Connecticut 06357.

16. Defendant CO Lt. Welbi Vega was assigned to the shift overnight prior to the birth of Baby N and was assigned to patrol the cell block where Plaintiff Tianna Laboy was housed from February 12, 2018 to February 13, 2018.

17. Upon information and belief, CO Lt. Welbi Vega can be served at 201 West Main Street, Niantic, Connecticut 06357.

3

18. Defendant CO Lt. Scott York was assigned to the shift overnight prior to the birth of Baby N and was assigned to patrol the cell block where Plaintiff Tianna Laboy was housed from February 12, 2018 to February 13, 2018.

19. Upon information and belief, CO Lt. Scott York can be served at 201 West Main Street, Niantic, Connecticut 06357.

20. Defendant DOC is a public entity for the purposes of Title II of the ADA. The DOC is sued as a public entity because of its harmful, discriminatory conduct against Plaintiff Tianna Laboy.

21. Plaintiffs T. Laboy and Laboy ex rel Baby N. maintain that the deprivation and violations of their constitutional rights were carried out pursuant to the rules, regulations, customs, policies and practices of Defendant Semple acting under the color of state law, and Defendant Semple knowingly caused the plaintiffs to be deprived of their constitutional rights.

22. Defendant Semple was a supervisor of all corrections officers in the DOC, and his failure to act on information indicating that unconstitutional acts were occurring makes him liable for deliberate indifference.

23. Defendant Semple, as the supervisor of all corrections officers in the DOC, failed to supervise his subordinates who committed such wrongful acts.

24. Plaintiffs T. Laboy and Laboy ex rel Baby N. can show an affirmative link between Defendant Semple's inaction and the injuries suffered by the plaintiffs.

25. Defendant Semple failed to defer to the opinions of medical professionals like Dr. Kathleen Maurer, who told him inmate medical care was insufficient and likely to lead to irreparable harm to certain incarcerated individuals.

4

26. Defendant Semple failed to make changes to policy, procedure and the MOA as recommended by state auditors.[1]

27. Each defendant was acting under color of law at all times relevant to this action.

### Personal Jurisdiction

28. This Court has personal jurisdiction over all Defendants in this case as this case arises out of federal question jurisdiction, 28 U.S.C. § 1331, for the 42 U.S.C. § 1983 claims.

### General Allegations

29. On or about August 15, 2017, Plaintiff T. Laboy was incarcerated by the DOC at York as a pre-trial detainee in the mental health unit.

30. York is the women's facility that is part of Connecticut's unified prison system, which houses both pre-trial detainees and sentenced inmates.  York is located at 201 West Main Street, Niantic, Connecticut.

31. Upon Plaintiff T. Laboy's incarceration, she was approximately eight weeks pregnant.

32. This was reported to the DOC upon her intake on August 15, 2017 and was reported on a Form HR 001 Intake Health Screening, as required by UCONN/CMHC policy and procedure E 2.01.

33. Due to the very early stages of Plaintiff T. Laboy's pregnancy, all prenatal care was provided by the DOC and UCONN/CMHC.

34. UCONN/CMHC policy and procedure G7.01, entitled Perinatal Care, indicates that "In those cases of high-risk pregnancy, specialty care from the community shall be provided

---

[1] https://www.cga.ct.gov/apa/reports/Correction,%20Department%20of_20170510_FY2012,2013.pdf, accessed July 29, 2019. Also https://www.cga.ct.gov/apa/reports/Correction,%20Department%20of_20180904_FY2014,2015.pdf, accessed July 29, 2019.

to the inmate as needed." The young age of T. Laboy qualifies her pregnancy as potentially high-risk under the community standards of care.[2]

35. Medical records indicate that T. Laboy was categorized as a high-risk pregnancy due to her age, medical conditions and initially being pregnant with twins. A subsequent ultrasound documented one twin as vanishing. One twin had died very early in the pregnancy and was reabsorbed by the uterus. No records discontinue this high-risk categorization.

36. Singleton pregnancies that have reduced to singleton because of vanishing twin syndrome are more likely to be delivered pre-term. Due to Plaintiff T. Laboy's vanishing twin syndrome, all Defendants should have had a higher index of suspicion for preterm labor.

37. Studies show an increased risk of preterm labor, anemia and low birth weight among many other possible complications for adolescent mothers.[3] There is also an increased risk for stillbirth, birth asphyxia and birth injury or trauma in young mothers.[4] The World Health Organization, as well as the previously cited studies, identifies adolescent mothers as 10-19 years of age. Ms. Laboy was 19 years old and therefore an adolescent at the time of her incarceration, and throughout the majority of her pregnancy. She turned 20 very shortly before giving birth. Pregnancy can be a serious health issue, and Puerto Rican women like Plaintiff T. Laboy suffer significantly higher rates of maternal mortality and infant mortality than their peers. In addition, unattended labor and delivery is a serious health issue.

---

[2] https://www.nichd.nih.gov/health/topics/pregnancy/conditioninfo/high-risk

[3] Safak Ozdemirci, Taner Kasapoglu, Derya Akdag Cirik, Neslihan Yerebasmaz, Fulya Kayikcioglu & Funda Salgur (2016) Is late adolescence a real risk factor for an adverse outcome of pregnancy?, The Journal of Maternal-Fetal & Neonatal Medicine, 29:20, 3391-3394, DOI: 10.3109/14767058.2015.1130814; Sunullah Soysal, Abdullah Sarioz, Gokce Anik Ilhan, Ali Kocagoz, Aylin Dizi, Ilhan Gursoy, Ipek Celik & Damla Ozmen (2019) Evaluation of late adolescent pregnancies: Is late adolescence a risk factor for preterm labor?, The Journal of Maternal-Fetal & Neonatal Medicine, 32:5, 851-856, DOI: 10.1080/14767058.2017.1393799

[4] Yasmin G, Kumar A, Parihar B. Teenage Pregnancy - Its Impact On Maternal And Fetal Outcome. Int J Sci Study. 2014;1(6):9-13

38. Plaintiffs T. Laboy and Baby N. were exposed to significant risk of fetal distress and injury and maternal distress and injury as a result of the lack of medical care provided by the Defendants.

39. Additionally, Plaintiff T. Laboy was at great risk for injury and pre-term labor due to mental health conditions.

40. Prior to her incarceration, Ms. Laboy spent nearly 30 days in an in-patient treatment program at the Hospital for Central Connecticut due to mental health concerns.

41. Ms. Laboy's treating physician at The Hospital for Central Connecticut documented the difficulty Ms. Laboy was likely to face by being incarcerated rather than treated in a facility.

42. The DOC and CMHC under the supervision of Defendant Semple had an obligation to ensure that policies and procedures were in place and that those policies and procedures applied appropriately to the situation at hand, that these policies and procedures were adhered to; and to assure that a pregnant adolescent inmate would not give birth in an unsanitary prison cell without any assistance from medical or corrections staff.

43. . Baby N. spent 14 days in the Neonatal Intensive Care Unit after her birth due to low birth weight, poor feeding and being more than 5 weeks premature.

44. As this case has progressed, Baby N. has now received an autism diagnosis, still does not speak and continues to be engaged with various social services to aid her development.

45. CMHC policy and procedure G2.01, entitled "Patients with Special Health Needs", states that "Correctional Managed Health Care (CMHC) staff shall ensure that health care services delivered to special needs inmates in the custody of the Connecticut Department of

Correction (CDOC) include written individualized treatment plans." The policy then goes on to include pregnant inmates as a group included in this policy.

46. No individualized treatment plan was documented in the medical records of Plaintiff T. Laboy.

47. CMHC Perinatal Care Policy G 7.01 directs that an inmate who identifies signs of labor shall be taken to the outpatient medical unit for evaluation. Upon information and belief, York Correctional Institute does not provide delivery services to inmate patients at the facility.

48. Policy G7.01 failed to include direction to medical staff at York on how to determine preterm labor. Thus the medical staff at York was not trained or in-serviced to identify preterm labor.

49. CMHC Policy G9.01, "Pregnancy Counseling," effective date April 1, 2001, holds that CMHC shall ensure that all pregnant inmates in DOC custody are provided with comprehensive counseling and assistance in keeping with their express desires in planning for their unborn children. One procedure in this policy states that prior to delivery, the inmate shall be linked with a community provider to assist with arrangements for the baby's care.

50. DOC Administrative Directive 8.12 Placement of Children Born to Incarcerated Woman, effective October 31, 2007, demands that the DOC shall assist in the Connecticut Department of Children and Families in the placement of children born to incarcerated women.

51. DOC Administrative Directive 8.12.6, Prenatal Coordination, states "The social work professionals from Lawrence and Memorial Hospital and the Department of Children and Families have primary responsibility for creating a placement plan for the newborn. As part of

the OB/GYN clinic, an inmate shall meet with a physician and a social work professional from Lawrence and Memorial Hospital to facilitate prenatal classes and a plan for placement of the newborn."  Upon information and belief, Ms. Laboy did not meet with any such professionals.

52. The community standard of care for medical records since 2012 has been to have electronic medical records.

53. CMHC did not institute electronic records until after 2017.

54. Failure to document or maintain relevant data is itself considered a significant breach of, and deviation from, the standard of care.

### *Plaintiff T. Laboy's Pregnancy*

55. Plaintiff T. Laboy was seen at regular intervals by Defendant Dr. Tricia Machinski. Her vital signs were taken and Dr. Machinski was able to ascertain Baby N.'s heartbeat.

56. There is no evidence that pregnancy counseling under G9.01 ever took place.

57. The OB/GYN was only available at York irregularly, despite serving a population of patients that could go into labor or have another life threatening emergency for either a mother or child at any moment.

58. Additionally, Dr. Machinski was the only gynecologist for the entire prison so any woman suffering from a gynecological problem would see her.  She did not work evenings, weekends nor was required to be "on call" for this population of inmates who may need her expertise.

59. Plaintiff T. Laboy's pre-natal care did not meet the very procedures set by CMHC policies and procedures.

60. During the course of Plaintiff T. Laboy's pregnancy she received two ultrasounds.

61. On January 22, 2018, Plaintiff T. Laboy presented to medical with a complaint that she was throwing up every time she ate for a week.

62. Upon information and belief, Plaintiff T. Laboy was last examined by Dr Machinski, prior to giving birth, on or around February 6, 2018.

63. On or around Wednesday, February 7, 2018, the Plaintiff T. Laboy was 34 weeks and four days pregnant. Medical reports indicate she complained of lower abdominal pain that comes and goes and she ranked her pain a 6 out of 10 (with 10 being the worst pain).

64. Warning signs of preterm labor include "five or more uterine contractions in one hour, watery fluid leaking from the vagina, low dull backache that is felt below the waistline that may come and go or is constant, pelvic pressure, and abdominal cramps." While Plaintiff recalls a discharge, the medical record does not indicate whether discharge was present or absent, suggesting that this was not checked.

65. She reported to "sick call" where she was told that she could see the doctor on Tuesday the 13th.  Plaintiff T. Laboy reported to "RN sick call" on February 7, 2018 at about 5 pm.  A fetal heart rate was documented but no other tests for preterm labor were documented as being performed.  Upon information and belief, a swab of vaginal secretions and/or use of litmus paper could have determined if amniotic fluid was present.

66. No cervical exam was made on February 7, nor do records indicate how long the fetal heart rate was monitored for, nor is there any mention of a uterine contraction pattern being measured or evaluated using guidelines accepted as a standard of care.

67. The nurse on call prescribed an increased intake of water for Plaintiff T. Laboy but no testing was done to actually determine if Ms. Laboy was in fact dehydrated.

68. On or around Saturday, February 10, 2018, Plaintiff T. Laboy returned to "RN sick call", again complaining of vaginal discharge and low abdominal pain.  Again it was noted there was no protocol for this complaint and Plaintiff T. Laboy was encouraged to return to sick call if symptoms persisted.  There is no documented attempt to contact an on-call or on-site doctor to do an exam of Plaintiff T. Laboy to ascertain if she was in preterm labor.

69. Plaintiff T. Laboy was told by medical staff she could not be seen by medical staff on Friday because she did not come with an appropriate medical form. Plaintiff T. Laboy then filled out a medical request form.

70. Upon information and belief, Dr. Machinski, was not available on the regular OB/GYN day of Friday, nor was there a substitute OB/GYN available.

71. On or around Sunday, February 11, 2018, the discharge became thicker and contained blood.

72. At this time, Plaintiff T. Laboy felt pressure downwards in her lower abdomen/pelvic area.  Plaintiff went to see medical but was told she should return if and when her contractions were less than 2 minutes apart.

73. On or around Monday, February 12, 2018 at approximately 11:00 p.m., the Plaintiff began having extreme abdominal pain.  She felt as if her stomach was twisting inside out.  She requested to see medical and was taken by wheelchair two buildings over by CO Alberto Ortiz.  Reportedly, the nurse on duty, Defendant Fiala, provided a cup of water and a warm cloth then told Plaintiff T. Laboy to return to her cell, advising that Plaintiff T. Laboy was not in labor. On the nursing encounter form, Defendant Fiala wrote "no protocol specific to this complaint" and "not in labor at this time."

74. Defendant Fiala did not perform an internal exam, did not perform any other testing to determine preterm labor, did not place a call to the on-call physician or Dr. Machinski, and did not review the prior medical records to see this was a persistent complaint.

75. For the remainder of the night, Plaintiff T. Laboy laid awake crying in pain.  certain officers in the area did rounds of the unit but told her there was nothing they could do as medical "didn't want to see her again".

76. A review of the log book for this evening indicates that two Lieutenants logged a tour of the unit but the investigation performed by the DOC into this matter (including a review of the videotapes) shows that they in fact did not tour the unit.  Due to this failure and recklessness, neither senior officer encountered the crying Ms. Laboy and they were not able to offer her any assistance.

77. Around 4:30 a.m. on Tuesday, February 13, 2018, Plaintiff T. Laboy had a large amount of bloody discharge while using the toilet.  She continued to experience extreme abdominal pain.  She activated the call button in her cell and again requested to see medical. Custody staff contacted medical and were again told by Defendant Fiala that Plaintiff T. Laboy needed to relax.  She was told the doctor would be in at 7:30 a.m. and could see the Plaintiff then.

78. Around 5:30 a.m. on Tuesday, February 13, 2018, Plaintiff T. Laboy walked to the cafeteria where she attempted to have breakfast. To prevent leakage onto the floor from her labor's continuous, sanguineous discharge, she placed a t-shirt between her legs, since she had no feminine hygiene pads or products available to her.

79. Plaintiff T. Laboy was hungry as she walked to the cafeteria, and she continued to experience abdominal pains and felt generally unwell. After a brief time in the cafeteria, she

managed to walk back to her cell only by using the prison walls for support. The walk back to the cell presented an extraordinary challenge because of the t-shirt between her legs and the extreme discomfort of being in labor.

80. Around 6:30 a.m. on Tuesday, February 13, 2018, Plaintiff T. Laboy sat on the toilet in her locked cell with only her cellmate present.  She wanted to change the bloody, discharge soaked t-shirt. She felt like she had to go to the bathroom, and she recalled that her mother told her if she feels that, be careful because it could be the baby coming. Upon sitting down, she realized that her baby was crowning.

81. Plaintiff T. Laboy again pushed the call bell for help, indicating that she had blood clots.

82. Custody staff again called medical where Defendant Fiala indicated that the APRN would see Plaintiff T. Laboy when she arrived.

83. At approximately 6:41 am on February 13, 2018; Plaintiff T. Laboy again activated her intercom from her cell to tell the custody staff that she had the baby.

84. Before the corrections staff or medical staff could arrive, Baby N. was born into the toilet.

85. Baby N. was born into the toilet. Baby N. was unresponsive after exiting the uterus. At this time, Plaintiff T. Laboy, prompted by her cellmate, picked up Baby N. and "patted her on the back to get all the fluid out." Baby N. began to breathe at this point.

86. Upon the arrival of corrections staff, a code white was called. A code white is a medical emergency within the prison walls.

87. It was several more minutes before medical staff arrived from several buildings away. Handheld video operated by custody staff is documented as signing on at 6:44 am and medical

13

staff arrives approximately 1 minute and 15 seconds into the video. This is approximately 5 minutes after the birth of Baby N.

88. Staff arrived in the cell without blankets, towels or the full obstetrics/birthing kit, despite custody staff alerting medical staff as to the extent of the situation. Towels and blankets arrive approximately 4 and a half minutes into the video and the obstetrics kit arrives more than 3 and a half minutes into the video. This timing is now nearly ten minutes after Baby N is born. One of the nurses who was present cut the umbilical cord.

89. The medical staff then proceeded to coach Plaintiff T. Laboy to push to deliver the placenta. The placenta was bagged and reportedly transported to Lawrence and Memorial Hospital.

90. Plaintiff T. Laboy and her minutes-old infant then sat in her cell for approximately 20 more minutes while medical staff ogled the baby and congratulated Plaintiff T. Laboy. Custody staff advised medical staff twice that the ambulance was on site but no move was made to relocate Plaintiff T. Laboy and Baby N into a wheelchair or towards the ambulance. In addition, when ambulance staff arrived at the door to the cell, they were instructed to leave so that T. Laboy could get dressed, despite the already 20-plus minute wait.

91. During the time staff were waiting, Baby N is not always heard crying and in fact is quiet the majority of the time. No staff appears to evaluate Baby N's respiratory effort, temperature, or perfusion status. In fact a thermometer did not even arrive in the room until nearly 13 and a half minutes into the video.

92. After Baby N was born, Defendant Fiala told T. Laboy that she "wasn't even contracting" and her chart was on the APRN's desk for review that morning at 7:30 a.m.

14

93. Despite the February weather, no warm clothing was placed around Plaintiff T. Laboy and only one blanket was placed over Baby N.

94. Plaintiff T. Laboy repeatedly requested assistance and medical care, as she believed she was in preterm labor from Wednesday, February 7, 2018 until the delivery of Baby N. on the morning of Tuesday, February 13, 2018.  Plaintiff T. Laboy's requests were ignored or dismissed by medical staff despite multiple requests from custody staff for assistance. Additionally, custody staff did not call 911 or initiate a "code white" at any other time on behalf of Plaintiff T. Laboy in the several days prior to the birth of Baby N., most particularly during the overnight from February 12, 2018 to February 13, 2018.

95. From Wednesday, February 7, 2018 to Tuesday February 13, 2018, despite her obvious symptoms of labor, no medical staff arranged for an internal examination of Plaintiff T. Laboy to determine if her cervix was either dilated or effaced, further physical symptoms of impending child birth.  No medical staff swabbed her vaginal secretions to determine if amniotic fluid was present.  Finally, no medical staff kept Plaintiff T. Laboy in the medical unit for one hour to monitor for contractions or called a physician for further orders including either transport to the hospital or an overnight stay in the infirmary.

96. In addition to the denial by the medical staff to obtain or provide appropriate medical care, the custody staff also failed to initiate a Code White or otherwise activate 911 prior to the birth of Baby N., despite the lack of response from medical staff.

97. If custody staff does not receive an appropriate response from the medical unit, the officer should call a Code White or contact a supervisor.

98. Had a supervisor toured the unit, they would have had first-hand knowledge of the distress of Plaintiff T. Laboy, and could have taken appropriate action.

99. CMHC/DOC does not provide any of its nurses with any training or in-services in regards to identifying preterm labor or any other labor or delivery topic.

100.     Upon her arrival at Lawrence and Memorial Hospital, Plaintiff T. Laboy was shackled to a bed by her ankles for the duration of her four day stay.

101.     Plaintiff T. Laboy has undergone extensive treatment and is still being treated for the medical ailments that are a result of her unsanitary delivery.

102.     Prior to the delivery of her child, Plaintiff T. Laboy had not discussed or designed a birthing plan with Dr. Machinski or any other medical staff, or a plan to have the child born at Lawrence and Memorial, as Administrative Directive 8.12.8 indicates.

103.     Upon information and belief, prison staff did not meet with Plaintiff T. Laboy to discuss custody of her child, nor was a representative from the Connecticut Department of Children and Families brought in to discuss the matter.  DOC Administrative Directive 8.12.6 was not followed. It was not until Plaintiff T. Laboy was in the hospital AFTER delivery of her baby that the staff there brought her the necessary paperwork to arrange for the post-discharge care of her baby.

104.     At no point in Plaintiff T. Laboy's prenatal care was she taken to a maternity ward, particularly the one at Lawrence and Memorial Hospital, to tour the unit and have the process of delivery explained to her.

105.     The DOC investigation into the birth of Baby N. charged Lt. Welbi Vega with violating the DOC standards of conduct policy A.D. 2.17 and the DOC policy U.D. 6.1 regarding Tours and Inspections.

106.     The DOC investigation into this matter found that Lt. Scott York violated the DOC standards of conduct policy A.D. 2.17 and the DOC policy U.D. 6.1 regarding Tours and Inspections.

107.     Discovery in this case has established that the DOC investigation into this matter found that RN Michele Fiala violated the DOC standards of conduct policy A.D. 2.17. In addition, RN Fiala failed to follow the CMHC policy regarding Perinatal Care G7.01, failed to notify an on-call provider of a change in a patient's condition, and failed to provide care and service under the MOA's Scope of Health services.

108.     The delay in treatment for Ms. T. Laboy after her requests for intervention, resulted in pain, suffering and mental anguish and violated her rights to be free from deliberate indifference and cruel and unusual punishment under the Fourteenth Amendment to the Constitution of the United States of America.


### *Baby N.'s Unlawful Presence in York Correctional Institute*

109.     Upon information and belief, normally, prison medical staff and custodial staff arrange for staff from the Department of Children and Families to visit a pregnant mother in jail to plan for the custody of the child well before birth. This did not happen with Plaintiff T. Laboy and Baby N.

110.     Pursuant to DOC Administrative Directive 10.6, entitled "Inmate Visits", effective date 10-23-2013, which was effective on February 13, 2018, subsection 3.D. identifies a child as a person under the age of 18.

111.     Under the Inmate Visits policy subsection 3.E., a Child Visit in a correctional institution occurs when a child is accompanied by an immediate family member or an authorized adult who is on the approved visiting list.

112.     Subsection 4.A.4. of the Inmate Visits policy indicates "A child shall be accompanied by an authorized adult immediate or expanded family member who is on the approved visiting list, legal guardian, an adult properly authorized by the Department of Children and Families, or an adult approved by the Unit Administrator. Children shall remain under the supervision of the adult visitor at all times while on grounds and during the visit."

113.     The DOC violated Administrative Directives 10.6 and 8.12 by allowing Baby N. to be born inside the prison. Baby N. was not accompanied by an authorized adult who was on Plaintiff T. Laboy's visiting list.

114.     Baby N., at her birth, was not committed and in the custody of the Connecticut Department of Children and Families under Conn. Gen. Stat. §17a-10.

115.     Baby N., at her birth, was not committed and in the custody of the Connecticut Department of Correction under Conn. Gen. Stat. §18-87.

116.     At the time of Baby N.'s birth, no court order existed under Connecticut Public Act 11-154 allowing the Department of Correction to place the child in a juvenile detention facility.

117.     Plaintiff Karine Laboy ex rel Baby N. expected Baby N. would be born in a hospital.

118.     Plaintiff T. Laboy expected Baby N. would be born in a hospital.

119.     Because Baby N. was not born in a hospital, she remained in the custody and care of her mother Plaintiff T. Laboy from the moment of birth until appropriate legal determinations and paperwork transferring custody occurred.

120.     Plaintiff T. Laboy did not temporarily sign over custody of her child until after Baby N. was in Lawrence and Memorial Hospital at least a day later.

121.     Plaintiff T. Laboy served as the guardian and enjoyed parental rights over Baby N. from the moment Baby N. was born.

122.     The State of Connecticut Court of Probate, District No. PD08, the Berlin Probate Court, officially removed Plaintiff T. Laboy as a guardian.

123.     Berlin Probate Judge Walter A. Clebowicz appointed Karine Laboy guardian of Baby N. on July 30, 2018.


**Security Division Investigation 2018-017**

124.     Pursuant to DOC Administrative Directive 1.10 et seq, a Security Division Investigation may be requested by the Commissioner or by one of his authorized agents.

125.     York Warden Santiago, an authorized agent, initiated a Security Division Investigation into the birth of Baby N. on February 22, 2018.

126.     The Security Division Investigation into the birth of Baby N. was labeled 2018-017and was completed in January, 2019.

127.     The Security Division Investigation contains a forensic medical evaluation by Dr. Jennifer Benjamin, and custodial Incident Report YCI-2018-02-037.

128.     Dr. Benjamin found in her report multiple violations of the standard of care, as well as multiple violations of DOC Administrative Directives, and the Memorandum of Understanding (also known as the Memorandum of Agreement) with CMHC and UCHC.

129.     Dr. Benjamin found that the York infirmary was not properly staffed, did not have adequate training and did not perform their exams as defined by the standard of care, and among other findings, she found that the birth of Baby N. was a violation of the DOC's duties in the Consent Decree in *West v. Manson,* H-83-366 (AHN).


### The Consent Decree in West v. Manson, H-83-366 (AHN)

130.     On October 13, 1988, the DOC entered into a Consent Decree in *West v. Manson* in the United States District Court for the District of Connecticut regarding medical care for women incarcerated by the DOC.

131.     The Consent Decree has never been lifted.

132.     Plaintiff T. Laboy is in the class of people covered by the Consent Decree. Plaintiff T. Laboy's in-prison birth has not been litigated in *West v. Manson*.

133.     The Consent Decree set the standard of care for pregnant women in the custody of the DOC.

134.     Section F. of the Consent Decree demands that DOC staff implement a program for pregnant women within three months of the Consent Decree.

135.     The Consent Decree, paragraph F1, states: "health care needs must be coordinated between the medical department and the consultant obstetrician to ensure that special maternal and fetal risks …are identified and jointly managed."

136.     The Benjamin Report used this precise language to indicate that the treatment Plaintiff T. Laboy received was a violation of the Consent Decree in *Manson v. West*.

137.     Paragraph F6 held "Regular prenatal classes shall be provided to all pregnant inmates regardless of security status. Nutrition information shall be provided in these classes"

138.     No such classes were offered to Plaintiff T. Laboy, in violation of the Consent Decree.

139.     Paragraph F9 of the Consent Decree states "[E]fforts shall be made to place pregnant inmates in their third trimester in rooms closest to the staff office in each housing unit unless the inmate requests otherwise."

140.     Plaintiff T. Laboy was never offered a closer cell.

141.     All Defendants knew or should have known about the Consent Decree.

142.     All Defendants were or should have been trained about the Consent Decree.

143.     All Defendants were bound by the Consent Decree.

144.     All Defendants failed to provide the level of care afforded by the Consent Decree.

145.     Dr. Benjamin found that the care given to Plaintiff T. Laboy violated the Consent Decree, specifically, that "Healthcare needs must be coordinated between the medical department and the consultant obstetrician to ensure that special fetal maternal risk are identified and jointly managed to optimize the pregnancy outcome."

146.     The Consent Decree demands an on-call obstetrician, and no on-call obstetrician was available for medical staff to contact and to coordinate care for Plaintiff T. Laboy.

147.     The standard of care for both pre-term labor and fetal well-being require an evaluation of a pregnant patient that was beyond the scope of the nurses at York on the night of February 12, 2018.  The Consent Decree was violated in this way as well.

### *The Memorandum of Agreement (In Part) Between CMHC and DOC*

148.     The Memorandum of Agreement ("MOA") between the DOC and CMHC defined the community standard of care as "Healthcare provided to inmate patients shall be consistent with the generally accepted practice in the State as recognized by healthcare providers in the same or similar general specialty as typically utilized to treat or manage a particular health care condition."

149.     DOC Medical Director Dr. Kathleen Maurer testified in a deposition on May 18, 2018 that the community standard of care is important because it provides a consistent pattern of care for patients who are within the responsibility of a care provider.

150.     Defendant Semple understood in 2015 that care being given to inmates by CMHC doctors and medical staff was regularly substandard. Defendant Semple received this information from a variety of sources including from conversations with Dr. Maurer, the state auditor reports regarding fiscal years 2012-2013, the numerous lawsuits brought on the basis of poor healthcare and audits and other written reports.

151.     Dr. Maurer testified that the DOC had an obligation to ensure that the community standard of care applied to patient care for inmates.

152.     Dr. Maurer further testified that the MOA had an enforcement mechanism including financial holdbacks but the amount of dollars to hold back to insure compliance was

very small and that furthermore, holdbacks did not seem to be something that could be done between state agencies.

153.    Dr. Maurer stated under oath that she repeatedly voiced her concern to Defendant Semple that the inmates were not receiving care that met the community standard of care.

154.    Dr. Maurer testified that she reviewed various cases that would come to her attention that raised her concerns about the failure of CMHC to meet the community standard of care.

155.    Delay of care was a repeated concern that came to Dr. Maurer's attention as she reviewed medical cases in the DOC.

156.    Dr. Maurer testified that under the MOA, she had no authority to force CMHC to take corrective action. Dr. Maurer did not know if DOC had the authority to force CMHC to take corrective action.  This is further stated in the state audits of DOC for fiscal years 2012-2013 and 2014-2015 where the auditors write that contractual terms are vague in terms of defining responsibility and DOC is unable to set standards for review.

157.    Dr. Maurer testified that there is a long distance between bad health outcomes and the MOA, but the distance could be travelled.

158.    Dr. Maurer testified that there was essentially no way to hold doctors accountable for their violations of the standard of care.

159.     At one point in time, the problems with healthcare delivery had become apparent within DOC leadership, and the Connecticut General Assembly demanded that the DOC issue a Request for Information ("RFI") to discover new companies that might contract with DOC. Dr. Maurer testified that she continued to ask about the RFI, but after one such

meeting, and Defendant Semple responded to her on more than one occasion that "We cannot embarrass our state's flagship university." Dr. Maurer testified that she interpreted Defendant Semple's response that she was to trade inmate health care for UConn's reputation.

160.     Defendant Semple told Defendant Maurer not to embarrass UConn.

161.     Dr. Maurer testified that she had concerns there would be consequences for her if she embarrassed UConn and the health care delivery system within the DOC.

162.     CMHC did periodic peer reviews of its medical staff, but Dr. Maurer realized after time that these peer reviews did not reflect an accurate view of the cases. Dr. Maurer saw after a number of cases that what a security investigation and her own DOC form would consider a violation of the standard of care, Dr. Wu's staff at CMHC when reviewing the same case would say there were no violations of policy and procedure.

163.     DOC has not made public any of these investigations or quality reviews conducted by CMHC.

164.     At some point, Dr. Maurer realized that UConn leadership had influence over DOC management. She was told by Dr. Trestman that there are many standards of care, and she responded to that by asking for exterior peer reviews.

165.     For two to three years, Dr. Maurer tried to get external peer reviews as a means of accountability to improve patient care. When that failed, Dr. Maurer asked for $50,000 to conduct her own external peer reviews. She wanted to take 25 cases and have them reviewed for $2,000.00 per case.

166.     Defendant Semple told Dr. Maurer he did not have the money for this review. So Dr. Maurer began searching for external sources of funds. She found that the National Institute of Corrections could provide her a $10,000.00 grant to fund the peer reviews.

167.     Dr. Maurer wrote a letter asking for the grant and Defendant Semple had to sign it. Defendant Semple never signed the letter. Dr. Maurer had asked Defendant Semple multiple times for peer reviews, and he demurred.

168.     Instead, Defendant Semple commissioned the Attorney General's office to perform the peer reviews of 25 of the worst cases of medical malpractice and neglect by CMHC medical staff in the DOC system.

169.     Tim Bombard, then Dr. Kathleen Maurer's assistant in the DOC, collected the information on the 25 cases that Dr. Maurer wanted peer reviewed. After he collected the data and stored it on his computer, he discovered that all the files had been deleted. Although the files were recovered, Dr. Maurer expressed concerns that the deletion may have been an aggressive act to prevent the peer review.

170.     On or about June 1, 2016, Defendant Semple hired the Criminal Justice Institute, Inc. ("CJI") of Hagerstown, Maryland to review the 20 or so cases of worst medical malpractice in the DOC system during the past several years. The Office of the State Comptroller paid CJI $63,000.00 out of the Department of Correction budget, with the expectation the work would be completed by March 1, 2017.

171.     Defendant Semple publicly provided competing rationale for the CJI report. To a committee of the Connecticut General Assembly, he testified that the CJI report was a medical review. To the Connecticut Freedom of Information Commission, Defendant Semple testified that it was a legal document designed to determine the extent of the DOC's liability in litigation.

172.     The CJI report remains locked under attorney-client privilege. Defendant Semple understood that the problems in DOC healthcare because of the MOA were so bad

public release of them would result in outcry that people were needlessly dying, so he hid the most egregious data rather than make wholesale changes to protect people in his custody.

173.     Upon information and belief, Wayne World's lawsuit was one of the cases in the CJI report, and that resulted in a $1.3 million settlement[5]. Mr. World was an inmate at OCI, and he claimed deliberate indifference due to systemic issues of delay, denial, underfunding, and understaffing. Mr. World also sued for misdiagnoses of an aggressive cutaneous t-cell lymphoma as psoriasis.

174.     Through the CJI Report, Defendant Semple had first-hand knowledge that medical care presented serious legal liability for the DOC, and that care at DOC was substandard.

175.     Upon information and belief, the case of Karon Nealy was included in the CJI Report. Mr. Nealy died in July 2015 from complications of an undiagnosed lupus at Manson Youth Institute.[6] The DOC internal security investigation into Mr. Nealy's death, read and signed by Defendant Semple, indicated understaffing of medical personnel created gaps in medical care and contributed to Mr. Nealy's death.

176.     Defendant Semple was also made aware of system-wide funding shortages that led to gaps in medical care by the Office of the State Auditor as early as summer 2016.

177.     In July 2015, Defendant Semple sent a letter to Dr. Trestman at CMHC complaining about CMHC's understaffing of the Mental Health infirmary at York, after Defendant Semple's mental health director, Dr. Craig Burns, saw problems with staffing during a *West v. Manson* site visit June 22, 2015.

---

[5] See *World v. CMHC, et al*, 3:16-cv-519 (JCH). Undersigned counsel represented Mr. World.
[6] See *Staten v. Semple, et al*, 3:18-cv-01251 (VAB). Undersigned counsel represents the estate of Mr. Nealy.

178.     In the three ensuing years, Defendant Semple never took reasonable action to insure the sufficiency of staffing levels in the mental health infirmary at York.

179.     In fact, CMHC encouraged staffing levels at York of no more than the absolute minimum.

180.     The state audit for fiscal years ending June 30, 2012 and 2013 state audit stated "The MOA between DOC and UCHC/CMHC is defined as a joint venture and collaborative arrangement between equals in providing health care services to the inmate population. However, this situation compromises DOC's primary responsibility as the agency charged with paramount security responsibilities, within which health care services must be provided. The operation of the joint venture appears impaired in achieving the objectives of the MOA by an absence of clear lines of authority." [7]

181.     The state auditor found multiple areas of concern, including the DOC's failure to monitor and manage the contract, and that the budget in the MOA is "inadequate for managing a contract of this magnitude and complexity. It defines objects of expenditures to responsibility centers defined by facility and major areas of health services, impairing management's ability to detect deviations from plan by point of responsibility." [8]

182.     The Audit maintained that the MOA was harming patients. In part, the Audit stated:

---

[7] State of Connecticut Auditors' Report, Department of Correction, Fiscal Years ended June 30, 2012 and June 2013, page 31
https://www.cga.ct.gov/apa/reports/Correction,%20Department%20of_20170510_FY2012,2013.pdf, Accessed July 21, 2019.
[8] *Id*. at 32.

a. "DOC is not exercising decisive influence in managing priorities and setting standards for UCHC/CMHC performance."[9]

b. "Vagueness in contractual terms and a general absence of measurable performance standards impair DOC's capability to ensure proper performance of service by UCHC\CMHC, and expose it to the risk of liability for failure to provide quality care."[10]

c. "The budget of the MOA understates the true cost of health care services provided by UCHC\CMHC to DOC, impairing effective fiscal assessment by other governmental agencies and public stakeholders. It does not sufficiently break down costs by responsibility centers, impairing effective management analysis by DOC."[11]

d. "Failure to define DOC ownership of both records and supporting systems may leave DOC with incomplete information in the event that this relationship is dissolved by either party. More importantly, control over the information but not the processes by which it is created and maintained is an incomplete scope of authority in a function such as this."[12]

e. "Insufficient independent monitoring by DOC of quality and quantity of care by UCHC\CMHC denies DOC the assurance that health needs are being met efficiently, economically, and effectively to prevent worsening and more costly complications; ensure the general health and well-being of the

---

[9] *Id.* at 33.
[10] *Id.*
[11] *Id.* at 34.
[12] *Id.*

inmate community; ensure the release of inmates to the general population in a sustainable condition; and mitigate the risk of litigation from allegations of medical malfeasance."[13]

183.     Defendant Semple then knew the myriad ways the MOA failed inmates.

184.     The DOC issued its reply to the audit in September 2016 (nine months before the Audit was actually published in May 2017). The DOC first stated it was attempting to develop and negotiate a new agreement with CMHC for the first quarter of Fiscal year 2016-2017. No new agreement was ever signed or negotiated.

185.     The DOC then stated: "Overall, the agency agrees with the auditor's findings and is working to address their concerns in the agreement currently being developed and negotiated."[14]

186.     Up until the termination of the MOA and relationship between UCONN CMHC and DOC, Defendant Semple made no substantive changes to the underlying agreement despite these statements.

187.     In a report of all 50 states' prison systems compiled by Pew Charitable Trusts published in October 2017, CMHC reported that there were no quality control measures in place, no morbidity and mortality review in place, no use of electronic records, no financial penalties (despite Dr. Maurer's testimony to the contrary), and no sharing of data with the public or the legislature (so essentially no oversight).[15]

---

[13] *Id.*
[14] *Id*. at 36.
[15] https://www.pewtrusts.org/en/research-and-analysis/reports/2017/10/prison-health-care-costs-and-quality, accessed July 17, 2019

188.    Defendant Semple understood in 2015 the MOA prevented him from having real oversight of CMHC, but he took no reasonable actions to correct the problems.

### *Plaintiff Tianna Laboy's Administrative Exhaustion*

189.    Upon information and belief, when Plaintiff T. Laboy returned to York after a four day stay at Lawrence and Memorial Hospital, on or about February 19, 2018, she met with Defendant Semple.  Defendant Semple apologized to Plaintiff T. Laboy for her treatment and advised her that the two medical staff who had been working the overnight from Monday February 12, 2018 to Tuesday February 13, 2018 were "walked out".  Plaintiff T. Laboy took this to mean that the employees were fired or otherwise disciplined for the treatment or lack thereof that she received.

190.    Defendant Semple had no ability to fire CMHC staff, but his only recourse - after the fact – was to ban these employees from DOC property.

191.    Nevertheless, Ms. Laboy had requested a grievance form prior to the visit by Defendant Semple.  Rather than being provided with a form, she received the visit.

192.    Even after this visit from Defendant Semple and hearing the information provided to her by the Defendant, Plaintiff T. Laboy continued requesting grievance forms, she never received any.

193.    The visit by Defendant Semple along with the Warden, satisfied any exhaustion of administrative remedies required of Plaintiff T. Laboy.  Her grievance was heard verbally by Defendant Semple when he visited.  A written grievance would not achieve any different outcome and would have been a waste of resources within the DOC.

194.    A DOC spokesperson acknowledged to the *New London Day* newspaper that Defendant Fiala and Defendant Simmons knew that Plaintiff T. Laboy was pregnant.[16]

195.    Defendant Semple appeared to acknowledge in a press release that the treatment given to Plaintiff T. Laboy did not meet the standard of care. After the birth of Baby N., Defendant Semple issued a statement "Although the details of this incident are still unfolding, I cannot overstate how seriously this agency takes the health and wellbeing of the offender population.  The goal of health services within a correctional environment should always strive to meet the community standard of care."[17] Plaintiff T. Laboy's pregnancy and the birth of Baby N. while in prison did not meet the standard of care, and that the situation was already being addressed, and any grievance form would be redundant.

196.    The DOC issued a statement contemporaneously which said: "The circumstances that led up to a baby being born inside a cell are still under investigation, however preliminary findings have led to two UConn Health, Correctional Managed Health Care employees being told not to report to the facility for work until the investigation is completed."[18]

197.    No complaint with the Connecticut Department of Public Health against Defendant Fiala's or Defendant Machinski's license to practice medicine had been filed until February 2019.  As of August 27, 2020, no disciplinary action or pending charges are

---

[16] "Birth inside York prison cell prompts DOC probe", February 15, 2018, https://www.theday.com/article/20180215/NWS04/180219605 last checked March 1, 2019

[17] For example, see Flood, Bill, "Baby born in cell at York women's prison, 2 UConn Health employees banned from facility", February 15, 2018, https://fox61.com/2018/02/15/baby-born-in-cell-at-york-correctional-two-uconn-health-employees-banned-from-facility/ last checked March 1, 2019.

[18] See Shay, Jim, "Baby born in Conn. Jail cell; investigation underway", the *Connecticut Post*, February 15, 2018; https://www.ctpost.com/local/article/Baby-born-in-Conn-jail-cell-investigation-under-12616253.php last checked March 1, 2019.

reflected in the state's E-Licensing database for Defendants Fiala or Dr. Machinski.

Additionally, Defendant Simmons does not appear in the database at all.

198.    On February 20, 2018, Defendant Semple testified before the Connecticut

General Assembly's Appropriations Committee and stated: "My concern is about the two

nurses that were specifically involved in this particular issue, and the decisions that were

made when request was made through the correctional staff --the correctional staff doing what

they were trained to do, making the appropriate contact to have medical response down into

the housing unit, that ultimate lead to the birth of the child."[19]

199.    Defendants Semple and Machinski and York and Vega failed to implement and

maintain policies, practices and procedures to assure that a pregnant inmate, in obvious

preterm labor, would not have a child born in an unsanitary jail cell being attended by

insufficiently trained and inexperienced medical staff.

200.    Defendants Semple, Machinski, Vega, York, Ortiz, Surreira, Fiala, and

Simmons were deliberately indifferent to Plaintiff T. Laboy's physical, emotional and mental

health as each of them, collectively and individually, caused the Plaintiff indignities, insults

and injuries that are incompatible with standards of societal decency.

201.    Dr. Benjamin's report in the Security Division Investigation found that CMHC

had understaffed the infirmary at York.

202.    Dr. Benjamin's report also indicated that nurses were not trained nor did they

receive in-service training regarding labor and delivery to include pre-term labor, and this

training could have been provided at the facility level.

---

[19] See Transcript, Appropriations Committee Public Hearing,
https://www.cga.ct.gov/2018/appdata/chr/pdf/2018APP00220-R001000-CHR.pdf page 44, last checked March 1,
2019.

**Count I – 42 U.S.C. § 1983 Deliberate Indifference as to Defendant Michelle Fiala in regards to Tianna Laboy**

203.　　　Paragraphs 1 through 202 are incorporated by reference as if more fully set forth herein.

204.　　　Defendant Fiala failed to provide an appropriate level of medical care to Plaintiff T. Laboy.

205.　　　Defendant Fiala failed to examine and understand what was happening with Plaintiff T. Laboy.

206.　　　Defendant Fiala knew that there was no oversight by CMHC or DOC over her provision of care to Plaintiff T. Laboy, and thus she did not have to do any work on Plaintiff T. Laboy's case because there would be no consequences for her if the care Plaintiff T. Laboy received was poor.

207.　　　Defendant Fiala did not utilize an appropriate index of suspicion when examining Plaintiff T. Laboy. Nor did Defendant Fiala offer an appropriate examination given the complaint Plaintiff T. Laboy presented with preterm labor.

208.　　　Defendant Fiala was consciously aware of the fact that she created or allowed a substantial risk to Plaintiff T. Laboy.

209.　　　Notwithstanding Defendant Fiala's conscious awareness of the risks to Plaintiff T. Laboy, she failed to take necessary and appropriate steps to reduce or eliminate the risk.

210.　　　Despite knowing the serious risks associated with the symptoms of preterm labor noted, Defendant Fiala, a medical provider, caused the emergency that resulted in the Plaintiff giving birth to her baby without any pain medication.  Additionally, Defendant Fiala, failed to alleviate the Plaintiff's terrible symptoms of pain, panic and emotional distress Plaintiff T. Laboy experienced by having her baby in an unsanitary jail cell.

33

211.    Dr. Benjamin found that Defendant Fiala:

a.   Failed to respond to custodial notifications regarding a patient's change in condition, which resulted in a Code White, and a baby being born in a toilet as a result of the lack of timely response;

b.   Failed to adhere to Perinatal Care Policy G#7.01 which directed transportation of a pregnant patient in preterm labor to an outside hospital;

c.   Failed to notify the on-call provider regarding the patient's change in condition, according to Policy A1.9, Infirmary Admission.

d.   Failed to comply with DOC Administrative Directive, Employee Conduct 2.17, including that Nurse Fiala failed to assess a patient who exhibited a change in condition; failed to cooperate truthfully during Dr. Benjamin's investigation; and failed to assess a pregnant patient when custodial staff reported a change in condition.

212.    Dr. Dr. Benjamin considered that Defendant Fiala committed a neglect of duty and jeopardized the health of an inmate.

213.    Notwithstanding the obvious, emergent, and readily recognizable symptoms of preterm labor suffered by the Plaintiff starting Wednesday, February 7, 2018, Defendant Fiala intentionally and with a reckless disregard of serious risks to the health and well-being of the Plaintiff and Baby N., refused Plaintiff T. Laboy's requests for attended hospital pre-birth care that every mother and child expect in our society as a decent and dignified means of delivering a child.

214.     Defendant Fiala exposed Plaintiff T. Laboy to a substantial risk of infection, blood loss, breach child birth, and death among the abundance of complications that could have occurred due to the lack of medical care provided to Plaintiff T. Laboy.

215.     When confronted with the information noted above regarding the Plaintiff's readily recognizable symptoms of late preterm labor and emergent birth, the Defendant intentionally and with a reckless disregard of serious risks to the health and well-being of the Plaintiff and Baby N., refused the Plaintiff's Fourteenth Amendment constitutional rights to a decent and dignified means of delivering her child in a facility staffed with personnel well trained and experienced in the delivery of a child in a carefully sanitized environment.

216.     Defendant Fiala violated the rights of Plaintiff Laboy under the Fourteenth Amendment to the United States Constitution to adequate medical care, to adequately trained staff, and to protection from harm by substantially departing from the accepted standards of care in the care and treatment of Plaintiff T. Laboy's pregnancy and subsequent birth of her daughter.

217.     The birth of Baby N. in a jail cell was caused by Defendant Fiala's unconstitutional actions and inactions alleged herein, and the conditions in which Plaintiff T. Laboy was forced to birth her daughter were beyond all bounds of decency, contrary to the norms of our society as developed over years of medical care provided to pregnant women, and were in violation of her constitutional rights.

218.     As a direct result of Defendant Fiala's violation of the Plaintiff's constitutional rights, Plaintiff T. Laboy suffered hours of intense pain, worry, trepidation prior to birth, and she has suffered and continues to suffer emotional agony reliving the horrifying jail birth and its medical after effects.

219.     In the manner described above, Defendant Fiala subjected the Plaintiff to cruel and unusual punishment and deliberate indifference in violation of rights secured to the plaintiff by the Fourteenth Amendment to the United States Constitution as enforced through Section 1983 of Title 42 of the United States Code.

WHEREFORE, on Count I of this Complaint, Plaintiff Laboy demands judgment against Defendant Fiala and prays for: (1) compensatory damages; (2) punitive damages; (3) attorneys' fees and (4) such other relief as the Court deems fair and equitable.

**Count II–42 U.S.C. §1983 Deliberate Indifference as to Defendant Brianna Simmons in regards to Tianna Laboy**

220.     Paragraphs 1 through 219 are incorporated by reference as if more fully set forth herein.

221.     Defendant Simmons failed to provide an appropriate level of medical care to Plaintiff T. Laboy.

222.     Defendant Simmons failed to examine and understand what was happening with Plaintiff T. Laboy. Defendant Simmons had no training in preterm labor.

223.     Defendant Simmons was on medical duty at the same time as Defendant Fiala from February 12, 2018 to February 13, 2018.

224.     Defendant Simmons did the medical rounds of the unit and interacted with Plaintiff T. Laboy a number of times over the course of the evening, and failed to provide Ms. Laboy with any medical care whatsoever.

225.     Defendant Simmons knew that there was no oversight by CMHC or DOC over her provision of care to Plaintiff T. Laboy, and thus she did not have to do any work on

Plaintiff Laboy's case because there would be no consequences for her if the care Plaintiff
Laboy received was poor.

226.     Defendant Simmons did not utilize an appropriate index of suspicion when
examining Plaintiff T. Laboy.

227.     Defendant Simmons was consciously aware of the fact that she created or allowed
a substantial risk to Plaintiff T. Laboy.

228.     Defendant Simmons provided Plaintiff T. Laboy the pitcher of ice water at about
11:30 pm February 12, 2018, while Defendant Fiala assessed Plaintiff T. Laboy.

229.     Defendant Simmons spoke with custodial staff throughout the night, when she
made rounds on the unit where Plaintiff T. Laboy was housed.

230.     Defendant Simmons knew or should have known that Plaintiff Laboy should have
been transported to a hospital immediately.

231.     Defendant Simmons failed to escalate the situation.

232.     Defendant Simmons visited the unit at least once during the night, and
interacted with Plaintiff T. Laboy at 2:30 a.m., and Defendant Simmons knew or should have
known that Plaintiff T. Laboy's condition was one of objective and subjective seriousness that
required immediate emergency intervention.

233.     Defendant Simmons knew or should have known that Plaintiff T. Laboy was in
preterm labor.

234.     Notwithstanding Defendant Simmons' conscious awareness of the risks to
Plaintiff Laboy, she failed to take necessary and appropriate steps to reduce or eliminate the risk.

235.     Despite knowing the serious risks associated with the symptoms of preterm labor
noted, Defendant Simmons, a medical provider, caused the emergency that resulted in the Plaintiff

giving birth to her baby unattended and without any pain medication.  Additionally, Defendant Simmons, failed to alleviate the Plaintiff's terrible symptoms of pain, panic and emotional distress the Plaintiff experienced by having her baby in an unsanitary jail cell.

236.     Notwithstanding the obvious, emergent, and readily recognizable symptoms of preterm labor suffered by the Plaintiff starting on Wednesday February 7, 2018, Defendant Simmons intentionally and with a reckless disregard of serious risks to the health and well-being of the Plaintiff and Baby N., refused Plaintiff T. Laboy's requests for attended hospital pre-birth care that every mother and child expect in our society as a decent and dignified means of delivering a child.

237.     Defendant Simmons exposed Plaintiff T. Laboy to a substantial risk of infection, blood loss, breach child birth, and death among the abundance of complications that could have occurred due to the lack of medical care provided to Plaintiff T. Laboy.

238.     When confronted with the information noted above regarding the Plaintiff's readily recognizable symptoms of late labor and emergent birth, the Defendant Simmons intentionally and with a reckless disregard of serious risks to the health and well-being of the Plaintiff and Baby N., refused the Plaintiff's Fourteenth Amendment constitutional rights to a decent and dignified means of delivering her child in a facility staffed with personnel well trained and experience in the delivery of a child in a carefully sanitized environment.

239.     Defendant Simmons violated the rights of Plaintiff T. Laboy under the Fourteenth and Fourteenth Amendments to the United States Constitution to adequate medical care, to adequately trained staff, and to protection from harm by substantially departing from the accepted standards of care in the care and treatment of Plaintiff T. Laboy's pregnancy.

240.    The birth of Baby N. in a jail cell was caused by Defendant Simmons'

unconstitutional actions and inactions alleged herein, and the conditions in which Ms. T. Laboy

was forced to birth Baby N. were beyond all bounds of decency, contrary to the norms of our

society as developed over years of medical care provided to pregnant women, and were in

violation of her constitutional rights.

241.    As a direct result of Defendant Simmons' violation of the Plaintiff's constitutional

rights, Plaintiff T. Laboy suffered hours of intense pain, worry, trepidation prior to birth, and has

suffered and continues to suffer emotional agony reliving the horrifying jail birth and medical

after effects.

242.    In the manner described above, Defendant Simmons subjected the Plaintiff T.

Laboy to cruel and unusual punishment and deliberate indifference in violation of rights

secured to the plaintiff by the FourteenthAmendment to the United States Constitution as

enforced through Section 1983 of Title 42 of the United States Code.


WHEREFORE, on Count II of this Complaint, Plaintiff T. Laboy demands judgment

against Defendant Simmons and prays for: (1) compensatory damages; (2) punitive damages;

(3) attorneys' fees and (4) such other relief as the Court deems fair and equitable.


**Count III - 42 U.S.C. § 1983 Deliberate Indifference Failure to Supervise as to Defendant
Dr. Tricia Machinski in regards to Tianna Laboy**

243.    Paragraphs 1 through 242 are incorporated by reference as if more fully set

forth herein.

244.    Upon information and belief, Defendant Dr. Machinski was the principal

physician at York and only obstetrician/gynecologist.

245.     Defendant Machinski's job description for principal physician includes responsibilities to:

    a.   conduct and participate in meetings on medical and administrative policy;

    b.   provide education and training as indicated, such as grand rounds or case conferences;

    c.   coordinate work of medical staff with related programs; and

    d.   review treatment plans, medical records, diagnoses and patient discharge plans for adherence to policies.

246.     Defendant Dr. Machinski knew or should have known that Policy G#7.01 failed to include instructions for preterm labor.

247.     Defendant Dr. Machinski knew or should have known UCHC had failed to provide training that would assist nursing staff to identify preterm labor in pregnant inmates.

248.     Defendant Dr. Machinski knew or should have known UCHC failed to provide four nurses on the third shift as required by the staffing plan.

249.     Defendant Dr. Machinski knew or should have known that a consultant obstetrician was not available on call for management of pregnant patients.

250.     Defendant Dr. Machinski was consciously aware of the fact that she created or allowed a substantial risk to Plaintiff T. Laboy.

251.     Defendant Dr. Machinski could have and should have acted to secure the provision of appropriate medical care for Plaintiff T. Laboy.

252.     Notwithstanding Defendant Dr. Machinski's conscious awareness of the risks to Plaintiff T. Laboy, she failed to take necessary and appropriate steps to reduce or eliminate the risk.

253.     Defendant Dr. Machinski's failure to supervise violated the rights of Plaintiff T. Laboy under the Fourteenth Amendment to the United States Constitution to adequate medical care, to adequately trained staff, and to protection from harm by substantially departing from the accepted standards of care in the care and treatment for Plaintiff T. Laboy during the final stages of her pregnancy.

254.     Defendant Dr. Machinski failed to insure that the medical staff reporting to her and caring for inmates at York was properly trained to deal with medical emergencies like preterm labor.

255.     Defendant Dr. Machinski intentionally and with a reckless disregard of serious risks to the health and well-being of the Plaintiff and Baby N., by failing to supervise properly her staff and insure that proper policies were in place, refused the Plaintiff's Fourteenth Amendment constitutional right to a decent and dignified means of delivering her child in a facility staffed with personnel well trained and experienced in the delivery of a child in a carefully sanitized environment.

256.     In the manner described above, Defendant Dr. Machinski subjected the plaintiff to cruel and unusual punishment in violation of rights secured to the plaintiff by the Fourteenth Amendment to the United States Constitution as enforced through Section 1983 of Title 42 of the United States Code.

WHEREFORE, on Count III of this Complaint, Plaintiff T. Laboy demands judgment against Defendant Dr. Machinski and prays for: (1) compensatory damages; (2) punitive damages; (3) attorneys' fees and (4) such other relief as the Court deems fair and equitable.

**Count IV – 42 U.S.C. § 1983 Deliberate Indifference as to Defendant COs Silvia Surreira and Alberto Ortiz in Regards to Tianna Laboy**

257.     Paragraphs 1 through 256 are incorporated by reference as if more fully set forth herein.

258.     Upon information and belief, Defendants CO Surreira and CO Ortiz knew Plaintiff T. Laboy was pregnant and in actual distress. Defendant CO Surreira and CO Ortiz took no action to provide medical assistance to Plaintiff T. Laboy or to transfer her to a facility where she could receive appropriate pre-birth care.

259.     Defendants CO Surreira and CO Ortiz were consciously aware of the fact that they created or allowed a substantial risk to Plaintiff T. Laboy.

260.     Defendants CO Surreira and CO Ortiz could have and should have acted to secure the provision of appropriate medical care for Plaintiff T. Laboy.

261.     Defendants CO Surreira and CO Ortiz, were on duty in the area housing Plaintiff T. Laboy the night of February 12th 2018.

262.     Defendants CO Surreira did rounds every 15 minutes and saw Plaintiff T. Laboy awake and crying in pain in her bunk yet did nothing to obtain medical care, activate a code white or activate 911 to obtain medical care for Plaintiff T. Laboy or her baby. Defendant CO Ortiz was stationed at the desk and was in regular contact with Defendant CO Surreira.

263.     Defendants Surreira and Ortiz at 4:30 a.m. February 13, 2018 were aware that Plaintiff T. Laboy was discharging clear liquids.

264.     Defendants Surreira and Ortiz at 6:30 a.m. were aware when Plaintiff T. Laboy made a distress call because of blood clots.

265.     Defendants Surreira and Ortiz had a duty to act in ways that did not jeopardize the health and safety of inmates.

266.     Defendants Surreira and Ortiz had a duty to call 911 if medical did not escalate.

267.     Notwithstanding Defendants CO Surreira's and CO Ortiz's conscious awareness of the risks to Plaintiff T. Laboy, they failed to take necessary and appropriate steps to reduce or eliminate the risk.

268.     Notwithstanding the obvious, emergent, and readily recognizable symptoms of labor suffered by the Plaintiff from Wednesday February 7, 2018, the Defendants CO Surreira and CO Ortiz intentionally and with a reckless disregard of serious risks to the health and well-being of the Plaintiff and Baby N., refused Plaintiff T. Laboy's requests for attended hospital pre-birth care that every mother and child expect in our society as a decent and dignified means of delivering a child.

269.     When confronted with the information noted above regarding the Plaintiff's readily recognizable symptoms of late labor and emergent birth, the Defendants CO Surreira and CO Ortiz intentionally and with a reckless disregard of serious risks to the health and well-being of the Plaintiff and Baby N., refused the Plaintiff's Fourteenth Amendment constitutional rights to a decent and dignified means of delivering her child in a facility staffed with personnel well trained and experience in the delivery of a child in a carefully sanitized environment.

270.     Defendants CO Surreira and CO Ortiz violated the rights of Plaintiff T. Laboy under the Fourteenth Amendment to the United States Constitution to adequate medical care, to adequately trained staff, and to protection from harm by substantially departing from the accepted standards of care in the care and treatment for Plaintiff Laboy during the final stages of her pregnancy.

271.     In the manner described above, Defendants CO Surreira and CO Ortiz subjected the plaintiff to cruel and unusual punishment in violation of rights secured to the plaintiff by the Fourteenth Amendment to the United States Constitution as enforced through Section 1983 of Title 42 of the United States Code.

WHEREFORE, on Count IV of this Complaint, Plaintiff T. Laboy demands judgment against Defendant Silvia Surreira and Defendant Alberto Ortiz and prays for: (1) compensatory damages; (2) punitive damages; (3) attorneys' fees and (4) such other relief as the Court deems fair and equitable.

**Count V – 42 U.S.C. § 1983 Deliberate Indifference as to Defendant CO Lt. Welbi Vega and Defendant Lt. York in Regards to Tianna Laboy**

272.     Paragraphs 1 through 271 are incorporated by reference as if more fully set forth herein.

273.     Upon information and belief, Defendant CO Lt Vega and Defendant Lt. York were on duty during the shift which ended in the birth of Plaintiff T. Laboy's baby (from the evening of February 12, 2018 to the morning of February 13, 2018).  As part of the nightly responsibilities, Lt. Vega and Lt. York should have toured the unit in which Plaintiff T. Laboy was housed.

274.     Upon information and belief, CO Lt. Vega and Lt. York noted in the log book that a tour was completed but video of the unit demonstrates that it was not.

275.     Defendants CO Lt Vega and Lt. York took no action to provide medical assistance to Plaintiff T. Laboy or to transfer her to a facility where she could receive appropriate pre-birth care.

276.     Defendants CO Lt. Vega and Lt. York were consciously aware of the fact that he/she created or allowed a substantial risk to Plaintiff T. Laboy.

277.     Defendant CO Lt. Vega and Lt. York could have and should have acted to secure the provision of appropriate medical care for Plaintiff T. Laboy.

278.     Defendant CO Lt. Vega and Lt. York were on duty the night of February 12th 2018.

279.     Defendant CO Lt. Vega and Lt. York had a duty to call 911 if medical did not assist an inmate with a medical emergency.

280.     When medical denied Plaintiff T. Laboy attention, upon information and belief, Defendant CO Lt. Vega and Lt. York could have activated a Code White on their own and obtained medical care for Plaintiff T. Laboy.

281.     Notwithstanding Defendant CO Lt. Vega and Lt. York's conscious awareness of the risks to Plaintiff T. Laboy, sthey failed to take necessary and appropriate steps to reduce or eliminate the risk.

282.     Notwithstanding the obvious, emergent, and readily recognizable symptoms of labor suffered by the Plaintiff from Wednesday February 7, 2018, the Defendant CO Lt. Vega and Defendant Lt. York intentionally and with a reckless disregard of serious risks to the health and well-being of the Plaintiff and Baby N., refused Plaintiff T. Laboy's requests for

attended hospital pre-birth care that every mother and child expect in our society as a decent and dignified means of delivering a child.

283.     When confronted with the information noted above regarding the Plaintiff's readily recognizable symptoms of late labor and emergent birth, the Defendant CO LT Vega and Defendant York intentionally and with a reckless disregard of serious risks to the health and well-being of the Plaintiff and Baby N., refused the Plaintiff's Fourteenth Amendment constitutional rights to a decent and dignified means of delivering her child in a facility staffed with personnel well trained and experienced in the delivery of a child in a carefully sanitized environment.

284.     Defendant CO Lt. Vega and Defendant Lt. York violated the rights of Plaintiff T. Laboy under the Fourteenth Amendment to the United States Constitution to adequate medical care, to adequately trained staff, and to protection from harm by substantially departing from the accepted standards of care in the care and treatment for Plaintiff Laboy during the final stages of her pregnancy.

285.     In the manner described above, Defendant CO Lt. Vega and Defendant Lt. York subjected the plaintiff to cruel and unusual punishment in violation of rights secured to the plaintiff by the Fourteenth Amendment to the United States Constitution as enforced through Section 1983 of Title 42 of the United States Code.

     WHEREFORE, on Count V of this Complaint, Plaintiff T. Laboy demands judgment against Defendant Lt. Vega and Defendant Lt. York and prays for: (1) compensatory damages; (2) punitive damages; (3) attorneys' fees and (4) such other relief as the Court deems fair and equitable.

**Count VI – 42 U.S.C. § 1983 False Imprisonment as to Defendant COs Silvia Surreira, Alberto Ortiz, Michelle Fiala, and Brianna Simmons in regards to Karine Laboy ex rel Baby N.**

286.     Paragraphs 1 through 285 are incorporated by reference as if more fully set forth herein.

287.     By the DOC's own Administrative Directives, Baby N. was unlawfully and illegally inside of York.

288.     Defendants CO Surreira, CO Ortiz, Fiala and Simmons had no legal justification to place Baby N. in the custody of the DOC.

289.     Defendant CO Surreira, CO Ortiz, Fiala and Simmons willfully detained Baby N. inside York.

290.     Defendants CO Surreira, CO Ortiz, Fiala and Simmons by their actions, intended to detain Baby N. As stated previously, Defendant CO Surreira, CO Ortiz, Fiala and Simmons understood the pregnant inmate confined to York was going to give birth at some point.

291.     Defendants CO Surreira, CO Ortiz, Fiala and Simmons upon hearing the labor pains of Plaintiff T. Laboy, intended that Baby N. would be born while in prison.

292.     Plaintiff T. Laboy and Defendants CO Surreira, CO Ortiz, Fiala and Simmons knew that Baby N. was not able to leave the prison.

293.     Baby N. did not choose to be born in a prison.

294.     Defendants CO Surreira, CO Ortiz, Fiala and Simmons had no probable cause to place Baby N. in a prison.

295.     Plaintiff Karine Laboy ex rel Baby N. could not merely walk into York to take her granddaughter out of York on February 13, 2018.

296.     In the manner described above, Defendants CO Surreira, CO Ortiz, Fiala and Simmons violated the rights of Plaintiff Karine Laboy ex rel Baby N. to be free from false imprisonment as those rights are secured by the Fourth Amendment to the United States Constitution as enforced through Section 1983 of Title 42 of the United States Code.


WHEREFORE, on Count VI of this Complaint, Plaintiff Karine Laboy ex rel Baby N. demands judgment against Defendant CO Surreira, CO Ortiz, Fiala and Simmons and prays for: (1) compensatory damages; (2) punitive damages; (3) attorneys' fees and (4) such other relief as the Court deems fair and equitable.


**Count VII – 42 U.S.C. § 1983 Deliberate Indifference as to Defendant Michelle Fiala and Brianna Simmons in regards to Karine Laboy ex rel Baby N.**

297.     Paragraphs 1 through 296 are incorporated by reference as if more fully set forth herein.

298.     Upon information and belief, Defendant Fiala and Defendant Simmons failed to provide an appropriate level of medical care to Baby N., both pre-birth and during birth.

299.     Defendant Fiala and Defendant Simmons knew that there was no oversight by CMHC or DOC over her provision of care to Baby N. both pre-birth and during birth, and thus she did not have to do any work on Plaintiff T. Laboy's case because there would be no consequences for her if the care Plaintiff T. Laboy and Baby N. received or did not receive was shocking.

48

300.     Defendant Fiala and Defendant Simmons did not utilize an appropriate index of suspicion when examining Plaintiff T. Laboy to ensure Baby N. received a reasonable standard of care.

301.     Defendant Fiala and Defendant Simmons were consciously aware of the fact that they created or allowed a substantial risk to Baby N. both pre-birth and during birth.  Baby N. was at significant risk for oxygen deprivation, decreased circulation and infection from her prolonged unmonitored labor.

302.     Notwithstanding Defendant Fiala and Defendant Simmons' conscious awareness of the risks to Baby N., they failed to take necessary and appropriate steps to reduce or eliminate the risk.

303.     Despite knowing the serious risks associated with the symptoms of preterm labor noted, Defendant Fiala, a medical provider with a reported 17 years of labor and delivery experience, and Defendant Simmons both caused the emergency that resulted in Baby N. being born into extraordinarily unsanitary and dangerous conditions to infant and maternal life.

304.     At this point, Plaintiff Karine Laboy ex rel Baby N. cannot be certain what damage this failure to monitor Baby N.'s well being during four days of active labor has had on Baby N., and if there will be permanent damage to Baby N. from the circumstances of her birth.

305.     Immediately after birth, the failure of Defendant Fiala and Defendant Simmons to be there, or to have monitored the four days of active labor appropriately so that Baby N. could have pediatric care upon birth is a breach of a standard of care, and put Baby N. in extraordinary harm and risk for future harm.

306.     Defendant Fiala and Defendant Simmons violated the rights of Plaintiff Karine Laboy ex rel Baby N. under the  Fourteenth Amendment to the United States Constitution to

adequate medical care, to adequately trained staff, and to protection from harm by substantially departing from the accepted standards of care in the care and treatment of Baby N., pre-birth, during birth and after birth. As a direct and proximate result of this defendant's unconstitutional acts and omissions, Baby N. experienced extreme physical pain and suffering and injury. It is foreseeable that these circumstances of her birth will cause Baby N. future shame, anguish and humiliation, and severe mental anguish, insult and indignity.

307.    In the manner described above, Defendant Fiala and Defendant Simmons subjected the Plaintiff, Karine Laboy ex rel Baby N., to cruel and unusual punishment and deliberate indifference in violation of rights secured to the plaintiff by the Fourteenth Amendment to the United States Constitution as enforced through Section 1983 of Title 42 of the United States Code.


WHEREFORE, on Count VII of this Complaint, Plaintiff Laboy ex rel Baby N. demands judgment against Defendant Michelle Fiala and prays for: (1) compensatory damages; (2) punitive damages; (3) attorneys' fees and (4) such other relief as the Court deems fair and equitable.

**Count VIIIV  - 42 U.S.C. § 1983 Deliberate Indifference as to Defendants Silvia Surreira, Alberto Ortiz, Lt. York and Lt. Vega in regards to Karine Laboy ex rel Baby N.**

308.    Paragraphs 1 through 307 are incorporated by reference as if more fully set forth herein.

309.     Defendants Surreira, York, Vega and Ortiz took no action to provide medical assistance to Plaintiff Laboy ex rel Baby N. or to transfer Plaintiff T. Laboy to a facility where she and Baby N. could receive appropriate pre-birth, during birth, and post birth care.

310.     Defendants Surreira, York, Vega, and Ortiz were consciously aware of the fact that they created or allowed a substantial risk to Plaintiff Laboy ex rel Baby N.

311.     Defendants Surreira, York, Vega and Ortiz could have and should have acted to secure the provision of appropriate medical care for Plaintiff Laboy ex rel Baby N.

312.     Notwithstanding Defendants Surreira's, York's, Vega's and Ortiz's conscious awareness of the risks to Plaintiff Laboy ex rel Baby N., they failed to take necessary and appropriate steps to reduce or eliminate the risk.

313.     Despite knowing the serious risks associated with the symptoms of labor noted, Defendants Surreira, York, Vega and Ortiz caused the emergency that resulted in Baby N. being born into extraordinarily unsanitary and dangerous conditions to infant life.

314.     The failure of Defendants Surreira, York, Vega and Ortiz to recognize the medical emergency to Plaintiff T. Laboy created forseeable risk to Baby N.

315.     Defendants Surreira, York, Vega and Ortiz violated Plaintiff Laboy ex rel Baby N.'s Fourteenth Amendment rights by acting with deliberate indifference to her serious medical needs and otherwise subjecting her to inhumane and unsanitary conditions of confinement related to her serious medical need amounting to punishment.  As a direct and proximate result of these defendants' unconstitutional acts and omissions, Baby N. experienced extreme physical pain and suffering and injury. It is foreseeable that these circumstances of her birth will cause Baby N. in the future shame, anguish and humiliation, and severe mental anguish, insult and indignity.

316.     Defendants Surreira, York, Vega and Ortiz violated the rights of Plaintiff Laboy ex rel Baby N. under the Fourteenth Amendment to the United States Constitution to adequate medical care, to adequately trained staff, and to protection from harm by substantially departing from the accepted standards of care in the care and treatment for Plaintiff Laboy during the final stages of her pregnancy.

317.     In the manner described above, Defendants Surreira, York, Vega and Ortiz subjected the plaintiff to cruel and unusual punishment in violation of rights secured to the plaintiff by the Fourteenth Amendment to the United States Constitution as enforced through Section 1983 of Title 42 of the United States Code.

WHEREFORE, on Count VIII of this Complaint, Plaintiff Laboy ex rel Baby N. demands judgment against Defendants Surreira, York, Vega and Ortiz and prays for: (1) compensatory damages; (2) punitive damages; (3) attorneys' fees and (4) such other relief as the Court deems fair and equitable.

**Count IX - 42 U.S.C. § 1983 Deliberate Indifference Supervisory Liability as to Defendant Dr. Tricia Machinski in regards to Karine Laboy ex rel Baby N.**

318.     Paragraphs 1 through 317 are incorporated by reference as if more fully set forth herein.

319.     Defendant Dr. Machinski took no action to provide appropriate protocols to for preterm labor medical assistance to Plaintiff T. Laboy or have policies to transfer her to a facility where she could receive appropriate pre-birth care for Baby N.

320.     Defendant Dr. Machinski knew or should have known that York lacked proper equipment in order to handle electronic fetal monitoring, and that this placed Baby N. at unnecessary risk.

321.     Defendant Dr. Machinski was consciously aware of the fact that she created or allowed a substantial risk to Plaintiff T. Laboy and Plaintiff Laboy ex rel Baby N. by extension.

322.     Defendant Dr. Machinski could have and should have acted to insure Baby N. was not born in prison by way of providing appropriate training and review of medical records and fulfilling her other duties as a supervisor.

323.     Notwithstanding Defendant Dr. Machinski's conscious awareness of the risks to Plaintiff Laboy ex rel Baby N., she failed to take necessary and appropriate steps to reduce or eliminate the risk.

324.     Defendant Dr. Machinski violated the rights of Plaintiff Laboy ex rel Baby N. under the Fourteenth Amendment to the United States Constitution to adequate medical care, to adequately trained staff, and to protection from harm by substantially departing from the accepted standards of care in the care and treatment for Plaintiff T. Laboy during the final stages of her pregnancy and by extension, Plaintiff T. Laboy's Baby N.

325.     Despite knowing the serious risks associated with the symptoms of labor noted, Defendant Dr. Machinski's failure to supervise caused the emergency that resulted in Baby N. being born into extraordinarily unsanitary and dangerous conditions to infant and maternal life.

326.     Defendant Dr. Machinski violated Plaintiff Laboy ex rel Baby N.'s Fourteenth Amendment rights by failing to supervise with deliberate indifference, disregarding the serious medical needs of Baby N. and otherwise subjecting her to inhumane and unsanitary conditions of confinement related to her serious medical need amounting to punishment.  As a direct and

proximate result of this defendant's unconstitutional acts and omissions, Baby N. experienced extreme physical pain and suffering and injury and was placed at great risk for significant injury and harm. It is foreseeable that these circumstances of her birth will cause Baby N. in the future shame, anguish and humiliation, and severe mental anguish, insult and indignity.

327.     In the manner described above, Defendant Dr. Machinski subjected the plaintiff to cruel and unusual punishment in violation of rights secured to the plaintiff by the Fourteenth Amendment to the United States Constitution as enforced through Section 1983 of Title 42 of the United States Code.

WHEREFORE, on Count IX of this Complaint, Plaintiff Laboy ex rel Baby demands judgment against Defendant Dr. Machinski and prays for: (1) compensatory damages; (2) punitive damages; (3) attorneys' fees and (4) such other relief as the Court deems fair and equitable.

**Count X - 42 U.S.C. § 1983 Deliberate Indifference Failure to Supervise as to Scott Semple in regards to Plaintiff Tianna Laboy**

328.     Paragraphs 1 through 327 are incorporated by reference as if more fully set forth herein.

329.     In 2014, after serving as warden of the state's mental health prison, on or about August 29, 2014 Defendant Semple was named deputy commissioner for operations and rehabilitative services in the DOC. In this role, Defendant Semple oversaw the daily operations of the 15 correctional facilities in Connecticut.

330.      This experience gave Defendant Semple a wealth of knowledge about the shortcomings of the health care delivery system in the DOC.

331.      Defendant Semple was first named acting commissioner of the state's largest agency, the DOC, in August 2014 by Governor Dannell P. Malloy.

332.      Governor Malloy named Defendant Semple Commissioner of the DOC on January 21, 2015, removing the interim or acting designation.

333.      Connecticut General Statutes § 18-81 designates the Commissioner of the DOC with responsibility to oversee all aspects of service to inmates in DOC custody.

334.      As part of the Commissioner of the DOC's duties to serve inmates, the Commissioner must arrange to provide health care for custodial inmates.

335.      To that end, the MOA between the DOC and the UCHC for the Provision of Health Services to Offenders through Correctional Managed Health Care was first created in 1997.

336.      Defendant Semple knew the DOC lacked sufficient management and informational tools to manage, monitor and evaluate the performance of UConn/CMHC under the MOA.

337.      Defendant Semple never supervised or instructed anyone on his staff to create and establish sufficient management and informational tools to manage, monitor and evaluate the performance of UConn/CMHC under the MOA.

338.      Defendant Semple knew the MOA was not defined in sufficient detail to specify the services to be provided by UConn/CMHC and the performance standards for assessing UConn/CMHC's compliance.

339.     Defendant Semple never supervised or instructed anyone on his staff to define in sufficient detail the specific services to be provided by UConn/CMHC and Defendant Semple never instructed or supervised anyone on his staff to draft and establish appropriate performance standards for assessing UConn/CMHC's compliance.

340.     Defendant Semple knew that the contractual terms and performance standards in the MOA were vague and could not establish measurable and verifiable performance standards for compliance.

341.     Defendant Semple never supervised or instructed anyone on his staff to draft, establish and implement measurable and verifiable performance standards for compliance with the MOA.

342.     Defendant Semple was tasked with attending executive committee and management committee meetings, but during the times at issue, these meetings were held irregularly, and Defendant Semple did not attend them regularly.

343.     Defendant Semple never trained or supervised anyone to attend those meetings and implement proper management structures for the MOA.

344.     Defendant Semple knew that the budget in the MOA was inadequate for managing the healthcare cost of more than 14,000 inmates.

345.     Defendant Semple knew that UConn/CMHC, in the case of inmate deaths, was allowed to evaluate its own performance. Defendant Semple knew that an effective MOA would include an independent review of death cases.

346.     Upon information and belief, Defendant Semple only initiated an independent review of death cases at the insistence of Dr. Maurer, and when Defendant Semple did initiate the independent review of death cases, as alleged previously, Defendant Semple purposely hid

the results behind the attorney-client privilege to avoid the bad publicity associated with the DOC failing to provide appropriate care to inmates in its custody.

347.    Defendant Semple knew that DOC had never reviewed many parts of the MOA, and only assumed that UConn/CMHC was complying with the provisions of the MOA.

348.    Defendant Semple never instructed or trained anyone on his staff to review all aspects of compliance with the MOA.

349.    Defendant Semple knew that DOC was not managing the UConn/CMHC MOA with appropriate diligence.

350.    Defendant Semple never instructed or trained anyone on his staff to manage the MOA with appropriate diligence.

351.    Defendant Semple knew that the absence of measureable performance standards prevented DOC from assessing UConn/CMHC's performance, and subjected the DOC to liability for failure to provide care.

352.    Defendant Semple never instructed or trained anyone on his staff to implement measureable performance standards into the MOA.

353.    Collectively, all of Defendant Semple's failures with regards to oversight of the MOA created a lax atmosphere of noncompliance, and wanton and willful disregard for human life within the UConn/CMHC. Defendant Semple needed to have implemented better supervision in the course of managing and implementing the MOA in order to prevent injuries such as sustained by Ms. Laboy and her baby.

354.    Defendant Semple tolerated and consistently ratified unconstitutional customs and practices that denied inmates and detainees their constitutional rights to adequate medical care for serious medical conditions.

355.     Defendant Semple did not want to offend the University of Connecticut and implement effective monitoring of the MOA. Defendant Semple told Dr. Maurer not to embarrass the state's flagship institution, which is the University of Connecticut. Defendant Semple told Dr. Maurer to place the school's reputation over that of inmate health care.

356.     Defendant Semple failed to supervise employees under his control who could have and should have been implementing effective monitoring of the MOA.

357.     The MOA was repeatedly extended by amendments, and on April 10, 2013, the Department of Correction extended it through June 30, 2015.

358.     Defendant Semple was regularly made aware by Department of Correction personnel, including Dr. Maurer, that the MOA was unenforceable, poorly written and was a direct cause of inmates in the care and custody of the DOC receiving subpar medical treatment that was known to endanger human life.

359.     In 2012, Defendant Semple was part of a committee that helped draft a strategic plan for UConn/CMHC. This strategic plan noted extensive challenges with the delivery of inmate healthcare.

360.     Nevertheless, the 2015 Strategic Plan for the Department of Correction does not even mention the word health care.[20]

361.     Nevertheless, on June 26, 2015, despite Defendant Semple's awareness of the unenforceability of the MOA, and despite his first-hand knowledge of the regular, repeated failures of UConn/CMHC to provide adequate care to inmates, Defendant Semple instructed deputy commissioner Cheryl Cepelak to extend the MOA.

---

[20]http://portal.ct.gov/DOC/Common-Elements/Common-Elements/Publications

362.     Defendant Semple knew that by signing this extension, he was endangering the safety of inmates like Tianna Laboy and her baby.

363.     Defendant Semple knew that inmates received inadequate care from the medical system he oversaw, yet Defendant Semple continued to engage UConn/CMHC as the main care provider for inmates like Plaintiff Laboy and her baby.

364.     Defendant Semple's failure to supervise employees properly regarding the implementation of the MOA directly resulted in the injuries to Ms. Laboy and her baby.

365.     The numerous violations of the community standard of care that UConn/CMHC subjected Ms. Laboy and Baby N. to were a direct result of Defendant Semple's continued failure to oversee and monitor the MOA properly.

366.     Defendant Semple knew that failure to measure the performance of UConn/CMHC under the MOA presented inmates with life threatening dangerous conditions, but Defendant Semple did not act.

367.     Defendant Semple's failure to act with the knowledge that his failure to act placed inmate in grave danger constituted deliberate indifference.

368.     Plaintiff Tianna Laboy and Plaintiff Karine Laboy ex rel Baby N. were damaged by Defendant Semple's deliberate indifference.

369.     Ms Laboy and her Baby N. are entirely foreseeable victims of Defendant Semple's deliberate indifference and Defendant Semple's failure to supervise his staff regarding the implementation of the MOA. The only way a child is born in a prison cell with no medical help is if there are egregious and outrageous systematic failures allowed to coalesce over time.

370.     Defendant Semple's policies and practices of allowing an MOA he knew to be ineffective at helping prisoners in medical distress combined with his failure to appropriately

supervise his staff regarding the MOA created an unreasonable risk of Fourteenth Amendment injury to Plaintiff T. Laboy and Plaintiff Laboy ex rel Baby N.

371.     Defendant Semple was clearly aware that such an unreasonable risk was created and existed.

372.     Defendant Semple was indifferent to that risk of Fourteenth Amendment injury to Plaintiff T. Laboy and Plaintiff Laboy ex rel Baby N.

373.     Plaintiff T. Laboy and Plaintiff Laboy ex rel Baby N.'s injuries resulted from Defendant Semple's policy and practice of failing to supervise employees regarding the implementation and monitoring of the MOA.

374.     This count is asserted against Defendant Semple in his individual capacity only.

375.     Defendant Semple was consciously aware of the fact that he created or allowed a substantial risk to inmates like Plaintiff Laboy and Baby N.

376.     Notwithstanding Defendant Semple's conscious awareness of the risk to inmates like Plaintiff T. Laboy and Baby N., he failed to take necessary and appropriate steps to reduce or eliminate the risk.

377.     Defendant Semple allowed a culture of deliberate indifference to run rampant through all of his prisons, so that all staff under his supervision ignored serious medical needs of prisoners like Plaintiff Laboy. Defendant Semple failed to supervise and manage his staff in a way so that every corrections officer understood and knew how to respond and prioritize medical health situations like that faced by Plaintiff Laboy.

378.     Defendant Semple violated Tianna Laboy's rights under the Fourteenth and Fourteenth Amendments to the United States Constitution to adequate medical care, to adequately

trained staff, and to protection from harm by substantially departing from the accepted standards of care in the care and treatment of Plaintiff Laboy.

379.     In the manner described above, Defendant Semple subjected Plaintiff Laboy to deliberate indifference in violation of rights secured to the plaintiff by the Fourteenth Amendment to the United States Constitution as enforced through Section 1983 of Title 42 of the United States Code.

WHEREFORE, on Count X of this Complaint, Plaintiff Laboy demands judgment against Defendant Scott Semple and prays for: (1) compensatory damages; (2) punitive damages; (3) attorneys' fees and (4) such other relief as the Court deems fair and equitable.

**Count XI - 42 U.S.C. § 1983 Deliberate Indifference Failure to Supervise as to Scott Semple in regards to Plaintiff Karine Laboy ex rel Baby N.**

380.     Paragraphs 1 through 379 are incorporated by reference as if more fully set forth herein.

381.     Collectively, all of Defendant Semple's failures with regards to oversight of the MOA created a lax atmosphere of noncompliance, and wanton and willful disregard for human life within the UConn/CMHC. Defendant Semple needed to have implemented better supervision in the course of managing and implementing the MOA in order to prevent injuries such as experienced by Plaintiff Laboy ex rel Baby.

382.     Defendant Semple knew that inmates received inadequate care from the medical system he oversaw, yet Defendant Semple continued to engage UConn/CMHC as the

main care provider for inmates like Plaintiff T. Laboy and subsequently her baby, Plaintiff Laboy ex rel Baby.

383.     Defendant Semple's failure to supervise employees properly regarding the implementation of the MOA directly resulted in the injuries to Plaintiff Laboy ex rel Baby N.

384.     The numerous violations of the community standard of care that UConn/CMHC subjected Plaintiff Laboy ex rel Baby N. to was a direct result of Defendant Semple's continued failure to oversee and monitor the MOA properly.

385.     Defendant Semple knew that failure to measure the performance of UConn/CMHC under the MOA presented inmates, and this case an unborn child of an inmate, with life threatening dangerous conditions, but Defendant Semple did not act.

386.     Defendant Semple's failure to act with the knowledge that his failure to act placed inmates in grave danger constituted deliberate indifference.

387.     Plaintiff Laboy ex rel Baby N. is an entirely foreseeable victim of Defendant Semple's deliberate indifference and Defendant Semple's failure to supervise his staff regarding the implementation of the MOA.

388.     Defendant Semple's policies and practices of allowing an MOA he knew to be ineffective at helping prisoners in medical distress combined with his failure to appropriately supervise his staff regarding the MOA created an unreasonable risk of Fourteenth Amendment injury to Plaintiff Laboy ex rel Baby N.

389.     Defendant Semple was clearly aware that such an unreasonable risk was created and existed.

390.     Defendant Semple was indifferent to that risk of Fourteenth Amendment injury to Plaintiff Laboy ex rel Baby N.

391.     Plaintiff Laboy ex rel Baby N.'s injuries resulted from Defendant Semple's policy and practice of failing to supervise employees regarding the implementation and monitoring of the MOA.

392.     This count is asserted against Defendant Semple in his individual capacity only.

393.     Defendant Semple was consciously aware of the fact that he created or allowed a substantial risk to inmates and their unborn children like Plaintiff Laboy ex rel Baby N.

394.     Notwithstanding Defendant Semple's conscious awareness of the risk to inmates like Plaintiff T. Laboy and subsequently her unborn baby, Plaintiff Laboy ex rel Baby N., he failed to take necessary and appropriate steps to reduce or eliminate the risk.

395.     Defendant Semple allowed a culture of deliberate indifference to run rampant through all of his prisons, so that all staff under his supervision ignored serious medical needs of prisoners like Plaintiff T. Laboy and subsequently her unborn baby, Plaintiff Laboy ex rel Baby N. Defendant Semple failed to supervise and manage his staff in a way so that every corrections officer understood and knew how to respond and prioritize medical health situations like that faced by Plaintiff T. Laboy and subsequently her unborn baby, Plaintiff Laboy ex rel Baby N.

396.     Defendant Semple violated Plaintiff Laboy ex rel Baby's rights under the Fourteenth Amendment to the United States Constitution to adequate medical care, to adequately trained staff, and to protection from harm by substantially departing from the accepted standards of care.

397.     As a direct and proximate result of this defendant's unconstitutional acts and omissions, Baby N. experienced extreme physical pain and suffering and injury. It is foreseeable that these circumstances of her birth will cause Baby N. in the future shame, anguish and humiliation, and severe mental anguish, insult and indignity.

398.     In the manner described above, Defendant Semple subjected Plaintiff Laboy ex rel Baby N. to deliberate indifference in violation of rights secured to the plaintiff by the Fourteenth Amendment to the United States Constitution as enforced through Section 1983 of Title 42 of the United States Code.

WHEREFORE, on Count XI of this Complaint, Plaintiff Laboy ex rel Baby N. demands judgment against Defendant Scott Semple and prays for: (1) compensatory damages; (2) punitive damages; (3) attorneys' fees and (4) such other relief as the Court deems fair and equitable.

**Count XII - 42 U.S.C. § 1983 Deliberate Indifference Failure to Protect As to Defendants Defendants Semple, Machinski, Simmons, Fialla, Ortiz, York, Vega Surreira by Tianna Laboy**

399.     Paragraphs 1 through 398 are incorporated by reference as if more fully set forth herein.

400.     The defendants acted intentionally and/or they recklessly failed to act with reasonable care even though they knew or should have known that Plaintiff T. Laboy was subjected to an excessive risk of harm.

401.     The defendants were deliberately indifferent to Tianna Laboy's right to protection from harm.

402.     The defendants' deliberate indifference was outrageous and egregious under the circumstances.

403.     The defendants' deliberate indifference shocks the conscience and constitutes a violation of Tianna Laboy's substantive due process rights.

64

404.     The defendants deprived Tianna Laboy of her right under the Fourteenth

Amendment to protection from harm, and are liable for redress pursuant to 42 U.S.C. § 1983.


WHEREFORE, on Count XII of this Complaint, Plaintiff Tianna Laboy demands judgment

against Defendants Semple, Machinski, Simmons, Fiala, Ortiz, York, Vega Surreira and prays

for: (1) compensatory damages; (2) punitive damages; (3) attorneys' fees and (4) such other

relief as the Court deems fair and equitable.


**Count XIII - 42 U.S.C. § 1983 Deliberate Indifference Failure to Protect As to
Defendants Defendants Semple, Machinski, Simmons, Fialla, Ortiz, York, Vega Surreira
by Plaintiff Karine Laboy ex rel Baby N.**

405.     Paragraphs 1 through 404 are incorporated by reference as if more fully set

forth herein.

406.     The defendants acted intentionally and/or they recklessly failed to act with

reasonable care even though they knew or should have known that Baby N. was subjected to

an excessive risk of harm.

407.     The defendants were deliberately indifferent to Baby N.'s  right to protection

from harm.

408.     The defendants' deliberate indifference was outrageous and egregious under

the circumstances.

409.     The defendants' deliberate indifference shocks the conscience and constitutes a

violation of Baby N.'s substantive due process rights.

410.     The defendants deprived Baby N. of her right under the Fourteenth

Amendment to protection from harm, and are liable for redress pursuant to 42 U.S.C. § 1983.

WHEREFORE, on Count XIII of this Complaint, Plaintiff Laboy ex rel Baby N. demands

judgment against Defendants Semple, Machinski, Simmons, Fiala, Ortiz, York, Vega Surreira

and prays for: (1) compensatory damages; (2) punitive damages; (3) attorneys' fees and (4)

such other relief as the Court deems fair and equitable.


**Count XIV – Americans With Disabilities Act Claim**

411.     Paragraphs 1 through 410 are incorporated by reference as if more fully set

forth herein.

412.     Defendant Department of Correction is a public entity covered by Title II of

the ADA, 42 U.S.C. §12131(1).

413.     The Department of Correction Department of Correction's administrative

directive 10.19, Americans With Disabilities Act, effective August 1, 2014.

414.     The DOC ADA Administrative Directive calls for reasonable accommodations

to be made for inmates with disabilities.

415.     Plaintiff T. Laboy suffered from conditions known to be disabilities under the

ADA. She is a qualified individual with disabilities within the meaning of the ADA. The

Plaintiff T. Laboy has one or more major physical or mental impairment that substantially

limits one or more major life activities including caring for oneself, concentrating and

thinking.

416.     Defendant DOC is a public entity as defined in Title II of the ADA.

417.     Defendant DOC has discriminated against Plaintiff T. Laboy by failing to treat her pregnancy in the context of her disabilities. Defendant DOC treated Plaintiff T. Laboy differently because of her disabilities.

418.     Defendant DOC did not appropriately screen Plaintiff Laboy for disabilities during intake. Defendant DOC had an affirmative duty to assess the potential accommodation needs of inmates with known disabilities.

419.     Defendant DOC has not appropriately obtained the assistance of mental health professionals to handle pregnant women with disabilities.

420.     Defendant DOC has failed to assess and plan for the need for the pregnant women with disabilities like Plaintiff T. Laboy who are in the custody of York CI, and no individualized assessment of Plaintiff T. Laboy has been done under the ADA.

421.     Defendant DOC failed to have sufficient, qualified staff members to facilitate communication and provide assistance to Plaintiff T. Laboy.

422.     Defendant DOC's discrimination of Plaintiff Laboy included the failure to take reasonable steps during her pregnancy such as training medical staff to handle preterm labor, training medical staff to recognize the unique challenges presented to pregnant, disabled women and providing the resources to York CI to meet the needs of pregnant disabled women.

423.     Defendant DOC failed to provide medical care for Plaintiff T. Laboy and her disabilities while she was a pretrial detainee. At least one other pregnant inmate who was not disabled received appropriate care and was not subjected to discriminatory treatment by the DOC.

424.     Defendant DOC ignored Plaintiff T. Laboy's requests for help prior to her delivering her baby because of her disabilities.

425.     Defendant DOC intended to discriminate against Plaintiff T. Laboy, in part by her placement in the mental health unit, which guaranteed that she would be seen in a negative, stigmatized manner. Plaintiff T. Laboy's mere presence in the understaffed mental health unit created a discriminatory pretext where staff did not take her complaints seriously, and because of the understaffing, there were simply not enough medical staff to handle all the issues that arise during a night shift.

426.     Defendant DOC has discriminated against Plaintiff T. Laboy and subjected her to harm through this discriminatory conduct.

WHEREFORE, on Count XIV of this Complaint, Plaintiff Laboy demands judgment against Defendant Department of Correction and prays for: (1) a declaration that Defendant Department of Correction violated Plaintiff Laboy's rights under the ADA; (2) an order that Defendant Department of Correction properly train all medical staff to treat pregnant women with disabilities in a non-discriminatory manner, including mental health treatment for post-partum depression ; (3) compensatory damages, and (4) such other relief as the Court deems fair and equitable.

**Demand for Jury Trial**

Plaintiffs hereby request a trial by jury of all issues triable by jury.

68

Dated: October 6, 2020

Respectfully submitted,

/s/ *Kenneth J. Krayeske*
Kenneth J. Krayeske, Esq.
Kenneth J. Krayeske Law Offices
 255 Main Street, Fifth Floor
Hartford, CT 06106
(860) 969-4911
 FAX: (860) 760-6590
attorney@kenkrayeske.com
Federal Bar # CT28498


/s/ *DeVaughn L. Ward*
DeVaughn L. Ward
Ward Law LLC
255 Main Street, 5th floor
Hartford, CT 06106
(860)869-4086
Fax: 860-471-8406
Email: dward@attyward.com
Federal Bar #CT30321

## CERTIFICATE OF SERVICE

I hereby CERTIFY that on October 6, 2020, a copy of the foregoing Second Amended
Complaint was electronically filed and served by mail on anyone unable to accept electronic
filing. Notice of this filing will be sent by e-mail to all parties by operations of the Court's
electronic filing system or by mail to anyone unable to access the Court's electronic filing
system as listed below. Parties may access this filing through the Court's CM/ECF System.

*/s/ Kenneth J. Krayeske*
Kenneth J. Krayeske, Esq.